MOORE, Judge.
Lee McElrath ("the father") petitions this court for a writ of mandamus directing the Walker Circuit Court ("the trial court") to vacate its order awarding pendente lite visitation to Faye Howard and Earnest Howard with the father's children, Terria McElrath and Taleah McElrath ("the children"), and to enter an order denying such visitation. We grant the petition and issue the writ.
Procedural History
On November 4, 2016, the children's maternal grandparents, Faye Howard ("the maternal grandmother") and Earnest Howard ("the maternal grandfather"), filed a complaint in the trial court, seeking, among other things, an award of visitation with the children. The father filed an answer to the complaint on March 14, 2017. On that same date, the father filed a counterclaim requesting, among other things, an order declaring Alabama's Grandparent Visitation Act ("the GVA"), § 30-3-4.2, Ala. Code 1975, facially unconstitutional. The maternal grandparents filed a reply to the father's counterclaim. The Alabama Attorney General was also served with the father's counterclaim because of the constitutional considerations at issue; the attorney general filed a reply to the father's counterclaim. See § 6-6-227, Ala. Code 1975. On October 25, 2017, the father filed a motion to dismiss the maternal grandparents' claims. On November 30, 2017, the maternal grandparents filed an emergency motion for holiday visitation. Following a hearing on the maternal grandparents' motion for holiday visitation on December 6, 2017, the trial court entered an order on December 7, 2017, awarding the maternal grandparents pendente lite visitation with the children. The father filed an emergency motion to stay enforcement of that order on December 20, 2017. The trial court had not ruled on the father's motion to stay at the time the father filed his petition for a writ of mandamus with this court on December 21, 2017. The father filed an amended motion to stay the trial court's order on that same date.
Facts
The maternal grandmother testified that the children's mother is her daughter, Salena Howard ("the mother"), and that the mother had never been married. She stated that the children were 11 and 12 years old, respectively, at the time of the hearing on the maternal grandparents' emergency motion for holiday visitation. According to the maternal grandmother, when Terria was released from the hospital following her birth, she was taken to the maternal grandparents' house where, the maternal grandmother said, the mother was also living at the time. The maternal grandmother stated that, at some point, the father had also lived at their house, but, she said, after Taleah was born, when the children were approximately 3 and 4 years old, respectively, the mother, the father, and the children moved in with the children's paternal grandmother, Sylvia McElrath ("the paternal grandmother"). The maternal grandmother testified that, when *366 the children had lived with her and the maternal grandfather, she had been their primary caretaker; she stated, however, that the father had provided for the children and that the mother had been present and had been a good mother to the children during that time.
According to the maternal grandmother, at some point, the father had gone to prison for six or seven years and, during that time, the children had lived with the paternal grandmother. The maternal grandmother testified that she and the maternal grandfather had seen the children periodically and had participated in school activities with the children. She stated that, during the time the father was incarcerated, the children had spent the night with the maternal grandparents, especially on weekends, every one to three weeks and that the children also had visited the maternal grandparents on holidays.
The maternal grandmother stated that, after the father was released from incarceration in 2013, the children had lived with the father, who, she said, was living with his girlfriend, Constance Clay, and that there were six children living in the household with him and Clay. The maternal grandmother stated that the father and the mother had not agreed on a schedule for the mother to visit the children. She testified that the mother had visited the children a week or two before the hearing on the maternal grandparents' emergency motion for holiday visitation and that the mother had taken the children to the maternal grandmother's house on that occasion. She also testified, however, that the mother had visited the children on other occasions but that she had not brought the children to the maternal grandparents' house or to visit the maternal grandparents on those occasions. The maternal grandmother testified that she had expressed to the mother that she and the maternal grandfather would like to see the children, that the mother had told them she would let them know when she visited with the children, but that the mother had not usually let them know. According to the maternal grandmother, she and the maternal grandfather had made requests of the father to see the children.
The maternal grandmother testified that the father is a good father and takes care of the children and that the children do well in school and are engaged in different types of sports and activities. She stated that, as far as she knows, the father does a great job of taking care of the children. She testified that she and the maternal grandfather had been allowed to see the children during the three years preceding the filing of the complaint for grandparent visitation, but, she said, the father had been the one to determine when they could see the children, and, she said, he had not allowed her to see the children as often as she would have liked. The maternal grandmother stated that, since the father had had custody, the children had not spent the night with the maternal grandparents on a regular basis. The maternal grandmother testified that she wanted to see the children because it would be in the children's best interest, because she loves them, and because she "just need[s] to see them because [she] miss[es] them so much."
The father testified that he had gone to prison for trafficking cocaine, that he had served his sentence, and that he had subsequently been released from probation for good behavior. He stated that he had been employed as a financial consultant since he was released from prison and that he had financially supported the children since that time. The father stated that, at the time of the hearing, he and the children were living with Clay, her two children with the father, and two of Clay's other *367 children. According to the father, he and the mother are on good terms and had worked out custody and support issues involving the children without intervention from a court. The father stated that the children had not spent the night with the maternal grandparents more than five nights in any one year since his release from incarceration and that, from 2013 until the maternal grandparents filed their complaint seeking visitation, the children had been seeing the maternal grandparents once a month or once every other month. The father stated that the children had not complained about wanting to see the maternal grandparents more often.
The father testified that he, Constance, and the maternal grandparents are all employed. He also stated that he had not allowed the maternal grandparents to visit with the children when it was not convenient. The father stated that, before the maternal grandparents had filed their complaint seeking visitation, he and the maternal grandparents had discussed, at times, the maternal grandparents' having visitation with the children. He testified that the maternal grandfather had approached him at his workplace and had told him that he and the maternal grandmother wanted to see the children more often. The father testified that he had told the maternal grandfather that, because he had six children in his household participating in different sports and activities, the maternal grandparents would need to contact him a week or more ahead of time to try to arrange visitation. According to the father, he had not heard from the maternal grandparents after that time.
Analysis
" ' "A writ of mandamus is an extraordinary remedy that is available when a trial court has exceeded its discretion. Ex parte Fidelity Bank, 893 So.2d 1116, 1119 (Ala. 2004). A writ of mandamus is 'appropriate when the petitioner can show (1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court.' Ex parte BOC Group, Inc., 823 So.2d 1270, 1272 (Ala. 2001)." ' "
Ex parte Brown, 963 So.2d 604, 606-07 (Ala. 2007) (quoting Ex parte Rawls, 953 So.2d 374, 377 (Ala. 2006), quoting in turn Ex parte Antonucci, 917 So.2d 825, 830 (Ala. 2005) ).
The father argues in his petition that the trial court erred in granting pendente lite visitation between the maternal grandparents and the children. The GVA provides for the entry of a pendente lite order granting temporary visitation rights to grandparents, pending a final order. Specifically, § 30-3-4.2(o ), provides:
"Upon filing an action under this section, after giving special weight to the fundamental right of a fit parent to decide which associations are in the best interest of his or her child, the court may, after a hearing, enter a pendente lite order granting temporary visitation rights to a grandparent, pending a final order, if the court determines from the evidence that the petitioner has established a significant and viable relationship with the child for whom he or she is requesting visitation, visitation would be in the best interest of the child, and any of the following circumstances exist:
"(1) The child resided with the grandparent for at least six consecutive months within the three years preceding the filing of the petition.
"(2) The grandparent was the caregiver of the child on a regular basis for at least six consecutive months within the three years preceding the filing of the petition.
"(3) The grandparent provided significant financial support for the child *368 for at least six consecutive months within the three years preceding the filing of the petition.
"(4) The grandparent had frequent or regular contact with the child for at least 12 consecutive months within the three years preceding the filing of the petition."
The father argues, among other things, that the trial court erred in awarding the maternal grandparents pendente lite visitation with the children because, he says, the materials before this court do not demonstrate that the evidence supported findings that a significant and viable relationship between the children and the maternal grandparents was established, that the trial court gave "special weight" to the father's decisions regarding visitation between the children and the maternal grandparents, or that the maternal grandparents produced clear and convincing evidence that, without court-ordered visitation, the children's well-being could be jeopardized. The father also asserts that the maternal grandparents failed to offer any evidence indicating that the circumstances listed in subsections (1) through (4) of § 30-3-4.2(o ) exist in the present case such that pendente lite visitation could have been awarded pursuant to the GVA.
In Ex parte Gentry, 238 So. 3d 66 (Ala. Civ. App. 2017), this court considered a petition for a writ of mandamus stemming from an award of pendente lite grandparent visitation. Regarding § 30-3-4.2(o ), this court stated, in pertinent part:
"Although it is not immediately apparent from the language used in § 30-3-4.2(o ), the best-interest analysis set out in the GVA requires a showing of actual or reasonably expected harm to the child. That is, the GVA requires a grandparent seeking to prove that grandparent visitation is in the best interest of a child to show, by clear and convincing evidence, all three of the following:
" '(1) The petitioner has the capacity to give the child love, affection, and guidance.
" '(2) The loss of an opportunity to maintain a significant and viable relationship between the petitioner and the child has caused or is reasonable likely to cause harm to the child.
" '(3) The petitioner is willing to cooperate with the parent or parents if visitation with the child is allowed.'
" § 30-3-4.2(e) (emphasis added). Section 30-3-4.2(a)(2) defines 'harm' as '[a] finding by the court, by clear and convincing evidence, that without court-ordered visitation by the grandparent, the child's emotional, mental, or physical well-being has been, could reasonably be, or would be jeopardized.' In addition, § 30-3-4.2(c)(1) acknowledges that a parents' decision regarding visitation is presumed to be in the best interest of his or her child. In order to rebut that presumption, § 30-3-4.2(c)(2) requires clear and convincing proof that the grandparent and the child have a 'significant and viable relationship,' § 30-3-4.2(c)(2) a., and that the requested '[v]isitation ... is in the best interest of the child.' § 30-3-4.2(c)(2) b."
238 So.3d at 78. This court concluded in Gentry that, in that case, the harm element had not been met, that the trial court had erred in substituting its decision regarding the children's best interest for the father's, and that the award of pendente lite grandparent visitation was not supported by sufficient evidence. 238 So.3d at 82-83
Like in Gentry, the evidence presented in the present case does not support the trial court's award of pendente lite grandparent visitation in accordance *369 with § 30-3-4.2(o ). The maternal grandmother's testimony indicating that she was simply seeking more visitation with the children, that she loves the children, and that the maternal grandparents and the children have a beneficial relationship is clearly insufficient to meet the requirements of § 30-3-4.2(o ). As this court observed in Gentry, "proof that a grandparent has a close, beneficial relationship with a child is not equivalent to proof that the child will suffer harm if that relationship is limited or terminated," and "evidence of a beneficial relationship alone fails to rebut the presumption in favor of a fit parent's decision." 238 So.3d at 82. Moreover, we agree with the father that the testimony presented at the hearing did not support a finding that, in the three years preceding the filing of the maternal grandparents' complaint seeking visitation, the children had resided with the maternal grandparents, that the maternal grandparents had been the caregivers of the children, that the maternal grandparents had provided significant financial support for the children, or that the maternal grandparents had had frequent or regular contact with the children during that period. See § 30-3-4.2(o )(1) through (4). The father has demonstrated a clear legal right to the relief sought in his petition. Accordingly, we grant the father's petition for the writ of mandamus, and we order the trial court to vacate its December 7, 2017, order awarding the maternal grandparents pendente lite visitation with the children and to enter an order denying pendente lite visitation to the maternal grandparents.
PETITION GRANTED; WRIT ISSUED.
Thompson, P.J., and Pittman, Thomas, and Donaldson, JJ., concur.